Filed 1/22/25  P. v. Gonzales CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ANGEL GONZALES,<br><br>    Defendant and Appellant. | F085775<br><br>(Super. Ct. No. BF174918A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Gregory A. Pulskamp, Judge.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

On April 30, 2017, a fight broke out at a local gas station between two rival gang members.  Defendant Angel Gonzales, an active Uptown Bakers gang member, rushed to

the aid of his fellow gang member, Isaiah Thornton.  During the altercation, defendant shot and killed rival gang member, Jonathan Canchola.

A jury convicted defendant of premeditated first degree murder (Pen. Code,[1] §§ 187, subd. (a), 189, count 1), and found true the gang-murder special circumstance (§ 190.2, subd. (a)(22)) (gang-murder special circumstance).  In a bifurcated trial, a jury found defendant guilty of the substantive gang offense (§ 186.22, subd. (a), count 5) (substantive gang offense), and found true the gang enhancements (§ 186.22, subd. (b)(1)) (gang enhancements), as alleged in counts 1, 2, 3, 4, and 6.[2]  Subsequently, the trial court sentenced defendant to an indeterminate term of life without the possibility of parole (LWOP), plus a term of 25 years to life, and a determinate term of 25 years 4 months.

On appeal, defendant contends:  (1) the trial court prejudicially erred when it failed to bifurcate the gang-murder special circumstance, as required by section 1109, and that this failure to bifurcate violates equal protection; (2) insufficient evidence exists to support the gang-murder special circumstance, the substantive gang offense, and the gang enhancements; (3) the prosecutor committed misconduct when he told the jury that first degree murder "does not require a plan," and his yellow light analogy further contributed to the misimpression that "substantially more reflection" is not required for first degree murder; (4) the trial court failed to instruct the jury regarding the great bodily injury enhancement (§ 12022.7, subd. (a)), thus necessitating dismissal; (5) the trial court erred when it imposed a 10-year term for the gang enhancement (§ 186.22, subd. (b)(1)) on count 1; and (6) the record does not establish the trial court was aware of its discretion to strike multiple enhancements pursuant to section 1385, subdivision (c).

---

[1]     All further references are to the Penal Code, unless otherwise stated.

[2]     As we discuss in detail below, defendant was convicted and sentenced to additional offenses and enhancements.

In his reply brief, defendant retracted his argument the trial court failed to instruct the jury regarding the great bodily injury enhancement (§ 12022.7, subd. (a)) and concluded that CALCRIM No. 3160 (great bodily injury) was in fact provided to the jury. Because defendant retracted this argument, we do not address this specific argument in this appeal. As to defendant's remaining claims, they also lack merit. Accordingly, we affirm the judgment.

## STATEMENT OF THE CASE

On October 27, 2022, the Kern County District Attorney filed a first amended information charging defendant with the premeditated first degree murder of Canchola (§§ 187, subd. (a), 189, count 1), with a gang-murder special circumstance (§ 190.2, subd. (a)(22)) and multiple firearm enhancements (§§ 12022.5, subd. (a), 12022.53, subds. (c) & (d)); assault by means of force likely to cause great bodily injury upon Canchola (§ 245, subd. (a)(4), count 2), with both a firearm (§ 12022.5, subd. (a)) and a great bodily injury (§ 12022.7, subd. (a)) enhancement; assault by means of force likely to cause great bodily injury upon J.M.[3] (§ 245, subd. (a)(4), count 3); assault by means of force likely to cause great bodily injury upon John Doe (§ 245, subd. (a)(4), count 4); active participation in a criminal street gang (§ 186.22, subd. (a), count 5), with both a firearm (§ 12022.5, subd. (a)) and a great bodily injury (§ 12022.7, subd. (a)) enhancement; and felon in possession of a firearm (§ 29800, subd. (a)(1), count 6), with a great bodily injury enhancement (§ 12022.7, subd. (a)). As to counts 1, 2, 3, 4, and 6, the first amended information also alleged a gang enhancement (§ 186.22, subd. (b)(1)). The first amended information further alleged defendant suffered both a prior strike offense

---

[3]     Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended. All further rule references are to the California Rules of Court.

3.

(§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d), 212.5) and a prior serious felony conviction (§§ 667, subd. (a), 212.5).

Finally, the first amended information alleged the following aggravating factors:

"It is further alleged that the defendant Angel Gonzales, committed a crime that involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness, within the meaning of California Rules of Court Rule 4.421(a)(1)[;] [¶]

"It is further alleged that the defendant Angel Gonzales, was armed with or used a weapon at the time of the crime, within the meaning of California Rules of Court Rule 4.421(a)(2)[;] [¶]

"It is further alleged that the defendant Angel Gonzales, induced others to participate in commission of the crime or occupied a position in leadership or dominance of other participants, within the meaning of California Rules of Court Rule 4.421(a)(4)[;] [¶]

"It is further alleged that Angel Gonzales, induced a minor to commit or assist in the commission of the crime, within the meaning of California Rules of Court 4.421(a)(5)[;] [¶]

"It is further alleged that Angel Gonzales, was convicted of other crimes for which consecutive sentences could have been issued but for which concurrent sentences are being imposed, within the meaning of California Rules of Court Rule 4.421(a)(7)[;] [¶]

"It is further alleged as to Angel Gonzales, that the manner the crime was carried out indicates planning, sophistication, or professionalism, within the meaning of California Rules of Court Rule 4.421(a)(8)[;] [¶]

"It is further alleged that Angel Gonzales, has engaged in violent conduct which indicates a serious danger to society, within the meaning of California Rules of Court Rule 4.421(b)(1)[;] [¶]

"It is further alleged that the defendant Angel Gonzales, has prior convictions as an adult that are numerous or of increasing seriousness, within the meaning of California Rules of Court Rule 4.421(b)(2)[;] [¶]

"It is further alleged that the defendant Angel Gonzales, has served a prior prison term, within the meaning of California Rules of Court Rule 4.421(b)(3)[;] [¶]

"It is further alleged that the defendant Angel Gonzales, was on probation or parole when the crime was committed, within the meaning of California Rules of Court Rule 4.421(b)(4)[;] [¶]

"It is further alleged that defendant Angel Gonzales, prior performance while on probation or parole was unsatisfactory, within the meaning of California Rules of Court Rule 4.421(b)(5)." (Capitalization omitted.)

Prior to the jury trial, the trial court granted trial counsel's request to bifurcate the substantive gang offense (count 5) and the gang enhancements but denied the request to bifurcate the gang-murder special circumstance.

On December 20, 2022, following phase I of the trial, the jury found defendant guilty on counts 1, 2, 3, 4, and 6, and found true all nongang enhancements and allegations, including the gang-murder special circumstance.[4] On that same day, following phase II of the trial, the jury found defendant guilty of count 5 and found true the firearm (§ 12022.5, subd. (a)) and great bodily injury (§ 12022.7, subd. (a)) enhancements, along with the gang enhancements (§ 186.22, subd. (b)(1)) alleged in counts 1, 2, 3, 4, and 6.

In a further bifurcated proceeding, the trial court found true the prior strike offense, the prior serious felony conviction, and all the alleged aggravating factors.[5]

---

[4] The jury did not make a finding as to the section 12022.5, subdivision (a) firearm enhancement alleged in count 1 because it is a lesser included enhancement of the section 12022.53 enhancements. (*People v. Fuller* (2022) 83 Cal.App.5th 394, 397.)

[5] As discussed in detail below, during defendant's sentencing the trial court realized defendant had never served a prison term, as alleged in the California Rules of Court, rule 4.421(b)(3) aggravating factor. The trial court did not consider this aggravating factor during sentencing.

As to count 1, the trial court sentenced defendant to a term of life without the possibility of parole (LWOP), plus consecutive terms of 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)), and a five-year term for the prior serious felony offense (§ 667, subd. (a)). The trial court further imposed a 20-year term for the firearm enhancement (§ 12022.53, subd. (c)) and a 10-year-term for the gang enhancement (§ 186.22, subd. (b)(1)) but stayed these terms pursuant to section 654. As to count 3, the trial court sentenced defendant to the upper term of four years, doubled to eight years because of the prior strike, plus a consecutive four-year term for the gang enhancement (§ 186.22, subd. (b)(1)) and a consecutive five-year term for the prior serious felony offense (§ 667, subd. (a)). As to count 4, the trial court imposed a term of two years (one-third the middle term of three years, doubled to six years because of the prior strike), plus a term of 16-months (one-third of four years) for the gang enhancement (§ 186.22, subd. (b)(1)), to run consecutive to count 3. As to counts 2, 5, and 6, the trial court stayed these sentences pursuant to section 654. The total aggregate sentence imposed was an indeterminate term of LWOP, plus 25 years to life, plus a determinate term of 25 years 4 months.

<strong><u>STATEMENT OF FACTS</u></strong>

**I.      Phase I:  Trial Regarding the Underlying Offenses**

**A.      *Prosecution's Case-in-Chief***

**1.      <u>The Gas Station Fight</u>**

On April 30, 2017, a fight broke out at a gas station on the corner of Mount Vernon Avenue and Columbus Street in Bakersfield. J.M. and his cousin Canchola went to the gas station store for food. Canchola ("Insane"),[6] who was affiliated with the "TWK"

---

[6]      Many of the participants in this case had a moniker or nickname associated with their gang membership. Gang members "use monikers to hide their identity and they're normally given monikers by members of the gang or they provide themselves their own moniker depending what they're into but a lot of it is used to hide their identity in case

6.

tagging crew, got into an argument with Isaiah Thornton ("Mugsy"), who was an active member of the Uptown Bakers gang.[7]  Thornton had gone to the store to buy blunt wraps.

At this same time, defendant ("Savage") hosted a birthday party for his girlfriend at a residence on Baylor Street (birthday party); a group of Uptown Bakers gang members attended the party.  Eventually, someone at the party received a phone call indicating that someone had jumped Thornton at the gas station.  "[E]very[one] [including defendant] [then] ran to the [gas station] for an altercation."

At the gas station, a fight broke out and J.M. heard someone yell, "Uptown," "[t]hree or four times."  The fight escalated and Canchola was subsequently shot and stabbed in the back.  Canchola later died as a result of a gunshot wound to his upper right chest.  J.M. was stabbed in his chest but survived.  J.M. testified he "had a knife, but it was on the … [l]ittle glove compartment on the side of the door" of his Hyundai Accent.  J.M. never grabbed the knife during the altercation.  Further, he testified he never observed Canchola with a knife.  An off-duty deputy heard the gunshot and immediately called 911.

The gas station's surveillance footage showed Thornton get out of C.E.'s white Pontiac and ask J.M. to buy something for him inside the gas station store.  The video then showed Thornton and J.M. fight, and then a large group of men arrived at the gas station.  The video also showed Jose M. ("Oner") run up and punch J.M.  At one point, Thornton placed Canchola in a headlock.  Renato Garza ("Tips"), who was wearing a

there's any crimes that may be associated with their doing."  For reference purposes only, we will refer to these individuals' monikers in parenthesis and quotes.  We will refer to their legal names throughout the extent of this opinion.

[7]     The True West Killers (i.e., "TWK" or "T Dub") "are now a subset of the East Side Bakers criminal street gang," whereas the "TFC" or "Too Fucking Crazy" tagging crew "formed a criminal street gang called Uptown Bakers."  As we discuss in more detail below, "TWK and Uptown Bakers [do] not get[] along because they throw up the Ts and they both wear the Texas Rangers MLB team hat that has the letter T on it."

dark blue hooded sweatshirt then stabbed Canchola in the back. Further, the video showed defendant holding a "black object in his hand."

J.M. then drove off with Canchola in his Hyundai and observed Canchola fall forward into the dashboard and start choking. J.M. arrived at the hospital and parked the vehicle in front of the north entrance to the emergency room. Later, officers located the vehicle and discovered a large amount of blood on the vehicle's interior and exterior. Officers searched the vehicle and located a large black knife in the center console with blood on the handle. There was another knife found on the driver's side door pocket. Officers also found a nine-millimeter firearm and ammunition locked up in a box inside the trunk. J.M. testified he owned the firearm, but stated he never used it during the gas station altercation.

### 2. Subsequent Law Enforcement Investigation

Subsequently, officers arrived on scene and located blood in the parking lot near the gas pumps. A blood trail led from the gas station to a nearby pharmacy where officers found a spent nine-millimeter shell casing in the pharmacy's parking lot. A second blood trail led to the birthday party. Officers then observed two individuals near this residence and proceeded to take them into custody. The first individual was identified as Joseph Bermudez ("Trips"), a member of the Uptown Bakers gang. Bermudez carried "[14] live .38[-caliber] rounds, two cell phones … and a pair of latex gloves" on his person. Officers also located a loaded .38 special revolver near where Bermudez was arrested. Bermudez told officers he went to the gas station to "pick up a homie" and that "he had that gun for protection for his family." The second individual was identified as Elisha

8.

Juarez ("Lil Savage"). Juarez had a blue bandana tied around his front waistband on his pants.[8]

Subsequently, on June 6, 2017, officers contacted Miguel Gutierrez ("Mikey/ Diablo") who was sitting inside a parked vehicle. Officers searched the vehicle and located a black semiautomatic pistol "between the right side of the passenger's seat and the passenger door." Officers seized the firearm and noticed it had a serial number of "FB8093," and later discovered it was stolen out of the State of Washington. Later, firearm analyst C. Snow analyzed the firearm and concluded the bullet casing recovered from the pharmacy's parking lot "was fired by the pistol … the Diamondback handgun," with the serial number FB8093. Gutierrez told officers he borrowed this firearm from defendant in return for $200 and some "dope."

### a. Jose M.'s Testimony and Statements to Law Enforcement

Jose was a member of the Uptown Bakers gang and attended the birthday party. Jose recognized other Uptown Bakers gang members at the party, including Thornton. He testified a female at the party received a phone call from Thornton indicating he needed help at the nearby gas station. Thereafter, a large group of people, including Jose and defendant, left the party and ran over to the gas station. Once at the gas station, Jose observed "people fighting and when people were fighting that's when [defendant] had the gun and shot the guy."[9] He also observed defendant fire a second shot into the air. Jose admitted that during the fight he attempted to punch J.M. After the altercation, Jose got

---

[8]    Officer Christian Hernandez, a qualified gang expert, testified the blue bandana was significant because the color blue "is consistent with the color that Sureños affiliate themselves with as well as Uptown Bakers."

[9]    The prosecutor showed Jose the gas station's surveillance footage and he was able to identify "the individual with the white T-shirt and the shaved head" as "the guy that [defendant] shot." Further, Jose testified he never observed either J.M. or Canchola with a knife.

9.

into a four-door white vehicle and drove back to the birthday party. Defendant and Thornton were also in the vehicle; defendant then told Jose, " 'Fool, I just shot him.' "

Later that night, officers informed Jose that Canchola was a member of TWK. Jose told officers the Uptown Bakers gang viewed TWK as a rival gang. He also told officers that defendant gave the gun to Gutierrez. As it related specifically to the Uptown Bakers gang, Jose testified Andrew Hernandez ("Dazyl" or "Dazzle") was in charge of the entire gang, whereas defendant "was … in charge of telling people what to do." Jose stated that "putting in work" or committing crimes for the gang increased a member's clout in the gang. He also confirmed a member would get in trouble if a fellow Uptown Baker gang member was getting jumped and that member just stood there and did not assist.

### b. Defendant's Arrest/Execution of Search Warrant

On December 20, 2018, officers arrested defendant during a vehicle stop. An officer located defendant's cell phone inside the vehicle. The cell phone's wallpaper photo had a picture of defendant wearing a Texas Rangers baseball hat. Officers then executed a search warrant at defendant's residence. Officers seized a cell phone, mail belonging to defendant, and a pair of black and white Jordan shoes.[10]

### 3. Gang Evidence

### a. Gang Expert Hernandez's Testimony

Officer Hernandez testified as a gang expert. He explained that "Bakersfield is a Sureño town, a southern town" and that "they affiliate or associate themselves with the color blue." Officer Hernandez indicated he is "familiar with the Uptown Bakers from prior contacts with members of the Uptown Bakers." Specifically, he testified he had observed "graffiti being displayed in many parts of the city with 'UTBKS,' which stands

---

[10] During closing argument, the prosecutor argued the seized black and white Jordan shoes were the same shoes worn by defendant in the surveillance footage.

for Uptown Bakers, 'X3' on it, which that represents 13 … which the letter 'M' is the 13th letter of the alphabet and that shows homage to the Mexican Mafia." "[T]he Sureños are the foot soldiers for the Mexican Mafia." The members associate "themselves with the Texas Rangers because the Texas Rangers baseball hat has a 'T' on it and that's for Uptown, the 'T' for Town. They'll affiliate themselves with the Indiana[polis] Colts NFL sports team hats or attire because the Indiana[polis] Colts, it has a Colt that's upside down and that forms the letter 'U' for Uptown." The gang's territory encompassed the area of northeast Bakersfield. The Uptown Bakers primary activities include "[p]ossession of firearms, murder, robberies, assaults with deadly weapons, burglaries … possession of stolen property[,] [and] [a]uto thefts." The Uptown Bakers do not get "along with the West Side Bakers and they don't get along with … in particular, TWK." Officer Hernandez testified that:

> "Gangs are all about respect. A gang member lives and dies by making sure that he is respected. Respect is like their main goal. Without respect a gang member will—their status will be very low. The more respect that a gang member has that means the more power he has, the more influence he'll have over fellow gang members."

He further testified regarding a situation where a gang member is "getting banged on." The testimony was as follows:

> "The term getting banged on is when one gang member sees another gang member and they start yelling out their gang or disrespecting their gang. Sometimes they'll shout it. They'll do hand signs. They'll flip them off. They'll give them the middle finger. Or sometimes they'll also come up to a person who they don't know who is in their boundaries and appears to be a rival gang member and they'll confront them and tell them where are you from and then they'll make sure that they're not a threat to them."

Further, the gas station where the murder occurred is within the "traditional boundaries of the Uptown Bakers." A dumpster had the letters "U, T and then the B," along with "X" and "3" near where Bermudez was taken into custody. Officer Hernandez also opined

11.

that Canchola had been a TWK member.  This opinion was based on the fact he made contact with an individual by the name of David Balderas, who "had 'TWK' tattooed on his face along with Uptown—a 'UTK' for Uptown Killer and he had East Side tattooed on him as well[,] [and] [o]n his forearm he had 'Rest in Peace Jonathan' with a portrait of Jonathan Canchola's face on his forearm."

As it related specifically to defendant, he had tattoos of a " 'U' and a 'T' for Uptown" on the right side of his face, "[a]nd on the right side of his neck it's a hand manipulating the letter 'E,' " which stands for the east side of Bakersfield.  He also had a "UT" tattoo on his right calf and a "Uptown" tattoo in cursive on his right quad.  On the top of his left hand, defendant "ha[d] the 'U,' the 'T,' the 'B,' the 'K,' and 'S' for Uptown Bakers."  He also had the major league baseball symbol on his left forearm, which "signif[ied] that they're a heavy hitter meaning they're putting in a lot of work for the gang.  Putting in work means committing crimes to benefit the gang."  Defendant also had a tattoo of his moniker "Savage" on the right side of his hand and a "KC" tattoo on his back, which indicated he is a Sureño from Kern County.  He also had a tattoo of "TWK" with the "W" crossed out to show disrespect to the rival gang.

### b.      Additional Gang Evidence

On May 17, 2015, at approximately 2:00 a.m., Officer Michael Malley responded to a residence regarding a discharge of a firearm.  Officer Malley arrived on scene and contacted defendant.  Defendant told Officer Malley that "he had been an Uptown Bakers gang member … [and] showed [Officer Malley] some of his Uptown Bakers gang graffiti at the end of the alley near the crime scene."  He also said, "the gang had been around in Bakersfield for about eight years and it had about 13 to 15 members."  He also told Officer Malley his moniker was "Savage."  Subsequently, Officer Kenneth Sporer interviewed defendant at the Bakersfield Police Department.  Defendant stated, "He and one of his friends were out in the alley … smoking when a random pickup truck came

12.

into the alley. They looked at each other, had some sort of exchange … [and] at some point … he punched the window of the truck and threw a rock at the truck and … an unknown occupant of the truck began firing gunshots in his direction." Later on in the interview, defendant told Officer Sporer "essentially he and his gang [Uptown Bakers] don't steal from people … they're all about hurting people instead."

On September 10, 2015, at approximately 8:15 p.m., Officer James Montgomery conducted a probation search at defendant's residence. Officer Montgomery searched defendant's bedroom and located "Uptown Bakers" and "Savage" written inside his closet. Officer Montgomery then asked defendant "if he was still rolling with Uptown" and defendant replied, " 'You know it.' "

In 2015, Detective Jesse Perez investigated graffiti incidents that occurred throughout Bakersfield. Defendant was the target of the investigation. On November 18, 2015, Detective Perez observed taggings such as "[t]he moniker Savage; an abbreviated name of that moniker of Sav …; Uptown Bakers; UTB; several variations of the letters and words of Uptown Bakers." Subsequently, Detective Perez contacted defendant at his residence and testified to his following observations:

> "He had a blue bandana neatly folded that was partially hanging out of his pants, his shorts at the time. There was also a baseball hat for the Texas Rangers that had the letter T on the bill, which I knew from my experience in the investigations I had that was related to the Uptown Bakers criminal street gang[.] [¶] … [¶] There was also graffiti and a crumpled-up piece of paper in the closet that had several other gang monikers written on it."

On November 2, 2016, Detective Perez contacted Kevin Stinslon ("Smokes"). Stinslon had a tattoo on his forearm "with the words Uptown Bakers and the letters U, [T] and B were capitalized." Thereafter, on May 1, 2017, Detective Perez responded to the 1500 block of Columbus Street and "observed a large amount of graffiti from Columbus Street just north of Lowe's in northeast Bakersfield [and] recognized several of the names that were spray-painted on a garage in an alleyway as members of the Uptown

13.

Bakers criminal street gang." "This particular area [was] considered the stronghold … of Uptown Bakers criminal street gang [and] [a]t the time there were several prominent members of the gang living in that area." Detective Perez then searched Bermudez and Thornton's Facebook accounts and discovered photographs of defendant, Bermudez, Jose, and Thornton all hanging out together.

On June 27, 2017, at approximately 12:13 a.m., Officer Bijan Gharib responded to an address regarding vandalism and a brandishing of a firearm. Officer Gharib contacted the victim who identified defendant and Juarez as the perpetrators.

On July 31, 2017, at approximately 4:21 p.m., Officer Randy Petris attempted to contact Thornton inside a residence.[11] "Thornton had a warrant for his arrest and once [officers] made contact [they] discovered he was trying to exit through a back window." Officers were able to apprehend Thornton before he fled on foot. Juarez and Garza were also present inside the residence. Officer Petris searched the residence and discovered "[a] live .38[-]caliber bullet and there was two Texas Rangers major league baseball hats and some graffiti that [officers] recognized as being a local street gang." Subsequently, Officer Petris interviewed Juarez and Garza who both admitted to being active Uptown Bakers gang members.

On June 7, 2018, at approximately 6:45 p.m., Officer Nestor Barajas contacted Bermudez and was provided a cell phone, pocketknife, and BB guns. The cell phone had " 'UTBKS 13' and then 'Trips' and then also 'Mugz' " written on it.

On July 13, 2018, at approximately 7:50 p.m., Officer Douglas Barrier responded to a residence in an attempt to locate Garza. Officer Barrier contacted both Garza and

---

**11** Officer Petris initially identified Thornton as "Elisha Thornton." However, immediately in response to the prosecutor's next question, he correctly identified the suspect as "Isaiah Thornton."

Bermudez who were standing on the front driveway. Bermudez had tattoos of a "horseshoe on his right forearm and the letter T on his right pinky."

On September 23, 2018, at approximately 2:55 a.m., Officer Alan Guardado responded to a shooting on Golden State Avenue. Officer Guardado contacted a victim, who had "a gunshot wound to his lower left leg just above his ankle." The victim told officers that Bermudez was the shooter and Eric Anthony Escalera[12] was the driver.

On October 1, 2018, Officer Nadine Yeary conducted a probation search at defendant's residence. Officer Yeary searched defendant's bedroom and located "a piece of paper with the words 'East' and 'Side' on it [¶] … [¶] [a]nd then inside the words 'East' and 'Side' there was 'Stoney' and 'Savage' written on it and then two T-shirts with 'Rip Sleepy T' and Rip Mike B.' "

### c. Predicate Offense No. 1

On April 14, 2015, at approximately 3:00 a.m., Officer Randall Moe was dispatched to a residence regarding an armed robbery. Officers searched the residence and "located a pair of keys that had an Oakland A's emblem … that belonged to the victim of the robbery … [and] also located a baseball bat that matched the description from what the victim had told [Officer Moe] when [he] was in contact with him." Officers also located blue bandanas. Defendant testified he held the bat while the others stole the victim's car keys and cell phone. However, defendant did admit the victim identified him as the individual with the gun. Subsequently, defendant, Hernandez, and Joshua Madrid were arrested for the robbery. All three individuals were active members of the Uptown Bakers gang.

---

[12] Escalera was initially charged as a codefendant in the underlying case. However, prior to the jury trial, Escalera accepted a plea deal and pled no contest to count 2 (§ 245, subd. (a)(4)), and admitted both a gang (§ 186.22, subd. (b)(1)) and a firearm (§ 12022, subd. (a)(1)) enhancement.

### d.      Predicate Offense No. 2

On December 27, 2015, at approximately 12:27 p.m., Officer Jeff Martin located a stolen gold Honda Accord. Officer Martin contacted two individuals by the names of Adolfo Gonzales and David Valles. Officers located a shaved key[13] in the ignition. Valles ("Tasor") was an active Uptown Bakers gang member.

### e.      Predicate Offense No. 3

On March 3, 2016, at approximately 8:57 p.m., Officer Matthew Aquino was dispatched regarding a potential stabbing. Officer Aquino arrived on scene and "observed a group of subjects on the front yard of a residence on that street[] [and] [u]pon contacting them there was an individual laying on the ground that was bleeding heavily." The victim had a stab wound on his upper left shoulder. Miguel Santiago, Spencer Rhines, and Isaiah Ness-Fontana were subsequently taken into custody for the stabbing. Santiago and Ness-Fontana were both active members of the Uptown Bakers gang when the offense took place.

### f.      Gang Expert Opinion

As to predicate offense No. 1, Officer Hernandez testified as follows regarding how the armed robbery benefitted the Uptown Bakers gang:

> "It was in the association of the Uptown Bakers because you have more than one individual from the Uptown Bakers that committed the offense. You have [defendant], you have [] [Madrid, and [] Hernandez who are all three working together to be more successful in this—in committing this crime. The robbery alone I know from speaking to several gang members as well as [defendant] that the proceeds that are made from this robbery, meaning that whenever they take these items they'll oftentimes sell it to make money, will go—not benefit just the members but the gang as well. I spoke to—I've spoken to several of their members who have told

---

[13]    Officer Martin testified "[a] shaved key is a key that is shaved front sides and the back. They make it really thin and they place it into the ignition which makes it easy for older model cars, especially Hondas, to steal the cars."

me that they put money on people's books, help out other fellow gang members as well as [defendant] who provided me similar information. I also know that the proceeds of—that are acquired from these robberies will go to purchase firearms, ammunition, and other weapons to distribute amongst the gang. [¶] … [¶] Robbery is a primary activity of the Uptown Bakers criminal street gang."

As to predicate offense No. 2, Officer Hernandez testified as follows regarding how the auto theft benefitted the Uptown Bakers gang:

"So vehicle theft is—it's in the benefit of the Uptown Bakers because oftentimes when they commit crimes they use a stolen vehicle or a vehicle that they borrowed from somebody else so that way the vehicle cannot be tied back to the person who committed the crime. So when a vehicle is stolen and there is no identifying information that that vehicle is this individuals because the license plate and registration is not going to come back to them. He's never been in that vehicle or anything like that. Another way that it would benefit the Uptown Bakers would be they will pretty much take all the parts out of the vehicle or take it to what's known as a chop shop. A chop shop is a place where vehicles are being taken apart so that way the parts can be sold therefore make money out of it. And in the same way that robberies benefit the gang obtaining the money from these vehicles would benefit them because they can put money [on] other member's books, assist other gang members, purchase firearm, ammunition, anything that the gang may need."

Auto theft is a primary activity of the Uptown Bakers gang and Valles was an active member of the Uptown Bakers gang.

Finally, as to predicate offense No. 3, Officer Hernandez testified as follows regarding how the assault benefitted the Uptown Bakers gang:

"It can benefit the Uptown Bakers in many different ways. So not only does it benefit the members who committed this offense as it bolsters their reputation that they're willing to commit such a violent act no matter what the circumstances are in daylight in public, it doesn't matter. It also bolsters the status of the gang itself, the Uptown Bakers, because it shows that they have members of this gang that are willing to be so violent and don't care to do it in public. Another way that it would benefit the Uptown Bakers would be the fear. So the fear that it would instill in the community and the fear that it will instill in other rival gang members so when these rival gang member[s] hear about this incident and who was involved they

are going to know that the Uptown Bakers are a force not to be reckoned with or that you have to be careful when you're coming up to them because of the violence that they can do—they can commit.  The fear in the community, I say it all the time when I used to be on patrol.  We used to respond to a shooting or stabbing and there would be individuals who witnessed the incident and they would not be willing to provide me any information because they were in fear of retaliation of what different gangs would do to them if they were to get caught providing this information, which is known as snitching.  [¶] … [¶]

"So when [the victim] was involved in the dispute with one of the members and then the other one joined in to assist him, that was viewed as disrespect.  He can't be disrespected or yelled at in public otherwise if people hear about that hey he got punched out or put in his place by another person that is not a gang member that is going to significantly hinder this gang member's appearance because he got put in check.  He got told what to do and got disrespected by somebody else.  So this—the fact that another member came in to assist him for such a petty thing such as you know, a dispute and ultimately resulted in killing this individual shows how much they value that respect."

As to the underlying offenses, Officer Hernandez testified it was committed in furtherance of and in the benefit of the Uptown Bakers gang.  Specifically, he testified as follows:

"So it was committed for the benefit of the Uptown Bakers because the Uptown Baker member who was at the gas station was involved and was—him and the TWK member were banging on each other, which is disrespectful.  At that point when he calls for backup, his other—when the other members of the Uptown Bakers respond to assist him, they eliminate that threat, which was that TWK gang member, and they also I guess teach them a lesson.  They take the course of not only assaulting him but stabbing him and also ultimately getting shot, killing him.  That would benefit the gang because it shows that they're not going to just stand by and let somebody disrespect them.  That they're willing to act violent and even murder someone.  That's going to benefit the gang a lot because it's going to give them respect not only with members of the community who hear about this but also with rival gang members who hear about this.  The rival gang members are going to know that whenever they're going to disrespect them that this is something that may potentially happen, which is a stabbing, a shooting, or possibly getting murdered.  So the rival gang

18.

members are going to be more hesitant to threaten them, disrespect them, or gang bang at an Uptown Baker.  [¶] … [¶]

"And it would also benefit the gang as well because they eliminate a member of the TWK.  So by eliminating this member from TWK that means that there is one less person from that gang that is going to commit crimes against the Uptown Bakers criminal street gang.  So if you eliminate one person that's one less person that's likely to assault you, kill you, shoot you[.]"

Further, the location of the murder at the corner of Mount Vernon Avenue and Columbus Street was significant for the following reasons:

"So right there in the corner of Mount Vernon and Columbus that's within the area—so just on the other side of Mount Vernon or right there on Mount Vernon, that's where the Colonia Bakers criminal street gang that's where their territory begins to the east of that.  So from the Mount Vernon to the east that's the Colonia Bakers criminal street gang territory.  From Mount Vernon to the west that would be the Loma Bakers criminal street gang as well the East Side Bakers criminal street gang and Uptown to the west a little bit to the north.  So that is significant because not only will TWK hear about what happened but it is also within the boundaries other gangs as well."

**B.**     *Defense's Case-in-Chief*

Defendant testified on his own behalf.  Defendant testified he became an Uptown Bakers gang member when he was either 12 or 13 years old.  He admitted he went to the gas station after hearing that two individuals were beating up Thornton.  At the gas station, he observed Canchola reach for an object from his ankle and he "thought it was a gun at first but [he] seen it wasn't due to the shape of it."  Rather, Canchola pulled out a large knife and began to "lung[e] towards one of the boys."  Defendant testified, "If I don't stop this then somebody is going to die.  Somebody else is going to get hurt and these are minors.  I can't allow that."  Therefore, he walked up to Canchola and fired one shot towards him, but he did not intend to kill him.  Defendant then admitted to firing an additional round in the pharmacy's parking lot.  He also admitted to "carry[ing] a gun everywhere … [because] at the time [he] was a gang member and … needed it for

19.

protection." Finally, he denied giving the firearm to Gutierrez, but rather he "gave it to one of [his] little homeboys to get rid of and they sold it to [Gutierrez]."

## II. Phase II: Trial Regarding the Substantive Gang Offense and Gang Enhancements

The prosecutor incorporated by reference all the evidence, including all exhibits, presented in phase I of the trial into phase II of the trial. The prosecutor called Officer Hernandez and presented him with a hypothetical that tracked the facts of the underlying case. With regards to the shooting, Officer Hernandez testified the offense benefitted and was committed in association with the Uptown Bakers gang as follows:

> "In regards to the shooting, I believe it's for the benefit of the Uptown Bakers criminal street gang due to that being a primary activity of the gang. When members of the gang commit shootings that's them putting in work. It's one their primary activities by them shooting a member of TWK, which is a rival of the Uptown Bakers. Once again TWK is a subset of the East Side Bakers criminal street gang so when they commit these shootings against a rival it not only bolsters the status, meaning it gives respect to the person who committed the shooting, but it also serves them as protection, protection against members because now they know what they're up against, what type of violence they're willing to commit in order to protect themselves. It also serves protection to them because they are civilians who are standing by hearing all this and I know from training and experience whenever we respond to communities where these gangs that are within the traditional gang boundaries, they're least likely to provide officers with information because they're afraid of the retaliation that may come from that. [¶] … In the association is because there was multiple members of the Uptown Bakers criminal street gang. Initially there was one while he was banging against a TWK member and once the fight ensued more members arrived, one of them having the firearm and committing the shooting while others were assaulting the other—the TWK member and his cousin because that's what they do. They back each other up. So that's how it was in the association of. [¶] In their culture it is expected for members of their gangs, their respective gangs, to back each other up. So if one member is in trouble it is expected that the other members, especially if they're nearby or within the area, to go back there and back that fellow gang member up with whatever it is that he may be confronted with."

20.

Officer Hernandez also testified the assault with a deadly weapon, assault with force likely to cause great bodily injury, and possession of a firearm charges were all committed for the benefit of and in association with the Uptown Bakers gang.

## DISCUSSION

### I.      Section 1109

First, defendant contends his "right to a fair trial was prejudiced by the trial court's failure to bifurcate the gang special circumstance [§ 190.2, subd. (a)(22))] as required by Penal Code section 1109." Second, defendant contends the failure to bifurcate the gang special circumstance pursuant to section 1109 violates equal protection pursuant to the Fifth Amendment of the federal Constitution. As to both contentions, we disagree.

### A.      *Additional Factual Background*

As noted above, in addition to the gang-murder special circumstance, defendant was also charged with numerous gang enhancements, and one count of active participation in a criminal street gang. Pursuant to section 1109, the People agreed to bifurcate the substantive gang offense and gang enhancements. However, the People objected to bifurcate the gang-murder special circumstance based on the plain language of section 1109, which does not reference section 190.2. The trial court agreed with the People and declined to bifurcate the gang-murder special circumstance. Specifically, the trial court ruled as follows:

> "My tentative thought, just to save you guys the time, is that when I look at the elements of [section] 190.2 (a)(22), it directly references various statutory provisions in [section] 186.22. So basically to establish the elements and the proof of the [section] 190.2 (a)(22) it is part and parcel to getting into the definition of a gang. So to get into the definition of a gang you have to get into all of those elements including predicate offenses and pattern of criminal—all of that. So it's a little bit of a legal fiction here but that's the way I see it. I don't see any bars to get into any of the evidence …. I think all of the gang evidence that you have, [prosecutor], could come into the case and chief. That's just my thought. When you get to the Phase 2, if there is one, it's almost like, you know, you just

21.

incorporate by reference in Phase 2 of the trial everything you presented in the first phase at least with [defendant]."

**B.** *General Legal Principles*

"In 2021, the Legislature passed Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), known as the STEP Forward Act of 2021.  (Stats. 2021, ch. 669, § 1.)  Assembly Bill 333 amended Penal Code section 186.22 by imposing new substantive requirements relating to gang enhancements and the criminal offense of gang participation.  (Stats. 2021, ch. 699, § 4.)  Assembly Bill 333 also added section 1109, which provides that, if requested by the defense, a trial court must try a gang enhancement charge separately from the underlying offense.  (§ 1109, subd. (a); Stats. 2021, ch. 699, § 5.)"  (*People v. Burgos* (2024) 16 Cal.5th 1, 7, fn. omitted (*Burgos*).)  Specifically, section 1109 states the following:

"(a) If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows:

"(1) The question of the defendant's guilt of the underlying offense shall be first determined.

"(2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement.  Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist in criminal conduct by gang members shall be proved by direct or circumstantial evidence.

"(b) If a defendant is charged with a violation of subdivision (a) of Section 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime.  This charge may be tried in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of Section 186.22."  (§ 1109.)

22.

Further, "Proposition 7 was approved by voters in a statewide election in November 1978. The statutory changes it made can be grouped into two categories: (1) it increased the penalties for first and second degree murder by amending section 190 [citations]; and (2) it sought to strengthen and expand California's death penalty with amendments to section 190.1 through 190.5[.]" (*People v. Cruz* (2020) 46 Cal.App.5th 740, 753–754, fn. omitted.) As it relates to the procedure for death penalty eligible cases, section 190.1 provides, in relevant part, the following:

> "A case in which the death penalty may be imposed pursuant to this chapter shall be tried in separate phases as follows:

> "(a) The question of the defendant's guilt shall be first determined. If the trier of fact finds the defendant guilty of first degree murder, *it shall at the same time determine the truth of all special circumstances charged as enumerated in Section 190.2* except for a special circumstance charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 where it is alleged that the defendant has been convicted in a prior proceeding of the offense of murder in the first or second degree." (§ 190.1, italics added.)

Further, section 190.4 provides, in relevant part, the following:

> "Whenever special circumstances as enumerated in Section 190.2 are alleged and the trier of fact find the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance. The determination of the truth of any or all of the special circumstances *shall be made by the trier of fact on the evidence presented at the trial* or at the hearing held pursuant to Subdivision (b) of Section 190.1." (§ 190.4, subd. (a), italics added.)

### C. *Applicable Law*

Another panel from this district has already addressed the issue of whether section 1109 requires bifurcation of a gang-murder special circumstance. (*People v. Montano* (2022) 80 Cal.App.5th 82 (*Montano*), disapproved on other grounds in *Burgos*, *supra*, 16 Cal.5th at p. 31.) In *Montano*, this court held that based on the express language of the statute, section 1109 does not apply to the gang-murder special

23.

circumstance. (*Montano*, at pp. 113–114.) There, the defendant argued "section 1109's silence regarding section 190.2 is a legislative oversight that must be corrected to prevent absurd results" because it effectively allows prosecutors to circumvent the bifurcation requirement by alleging a gang-murder special circumstance. (*Id*. at p. 112.) *Montano* disagreed because it would have required the court to " 'violate the cardinal rule that courts may not add provisions to a statute.' " (*Id*. at p. 113, quoting *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 827.)

Specifically, *Montano* analyzed section 1109 and found that it "says nothing about the special circumstance statutes, and its provisions are specific to section 186.22, subdivisions (a), (b), and (d)." (*Montano*, *supra*, 80 Cal.App.5th at p. 109.) "Summarized, section 190.1 'require[s] the truth of a prior murder conviction special circumstance be tried only after the guilt determination, but other special circumstances, including a gang special circumstance …, be determined at the same time as the guilt determination.' [Citations.] The limited exception for allegations of a prior murder conviction 'is intended for the benefit of capital defendants.' [Citation.] 'In essence, the statute recognizes that evidence of such a conviction may potentially have an inflammatory effect on jurors who are asked to determine a defendant's guilt or innocence on a current charge of murder.' " (*Id*. at p. 110.)

Further, *Montano* analyzed the legislative history of Assembly Bill 333 and found the following statement: " 'Existing Law: [¶] … [¶] Provides for a bifurcated trial process in determining guilt separately from punishment in cases where the death penalty may be imposed. (Pen. Code, Section 190.1.)' (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill 333, as amended July 13, 2021, pp. 1–4; accord, Assem. Com. on Public Safety, Rep. on Assem. Bill No. 333 (2021–2022 Reg., Sess.) as amended Mar. 30, 2021, pp. 2, 3.) This shows the Legislature was cognizant of the statutory procedures governing special circumstance murder allegations." (*Montano*,

*supra*, 80 Cal.App.5th at p. 113.)  Additionally, "[a]lso missing from section 1109 is any mention of the offense proscribed by section 182.5 [Crime of Gang Conspiracy] … [and it is] silen[t] regarding the gang-related vicarious liability provision of section 12022.53." (*Id*. at pp. 113–114, fn. omitted.)  Therefore, " 'even when a legislature likely would have enacted a differently worded law had it foreseen future developments, any statutory revision reflecting that reality must come from that legislature, not the judiciary.' " (*Ibid*.)  Accordingly, *Montano* concluded "that section 1109, as originally enacted by Assembly Bill 333, does not apply to the determination of special circumstance allegations under section 190.2(a)(22)."  (*Ibid*.)

### D.    *Analysis*

Defendant acknowledges *Montano*'s holding but urges us to conclude it was wrongly decided.  First, defendant contends section 1109 is applicable because the "elements of a subdivision 190.2, subdivision (a)(22) offense are defined in section 186.22 and proven by the same highly prejudicial gang evidence, [and] the Legislative intent to require bifurcation of highly prejudicial gang evidence under section 186.22 necessarily extends to section 190.2, subdivision (a)(22)."  Second, defendant contends "*Montano's* failure to give gang-[murder] special circumstances defendants the benefit of section 1109 violates equal protection."  (Capitalization omitted.)

### 1.    Section 1109 Does Not Apply to Section 190.2, Subdivision (a)(22)

At the outset, it appears that defendant agrees the plain language of section 1109 is clear in that enhancements charged pursuant to section 186.22, subdivisions (b) and (d), and substantive gang offenses charged pursuant to section 186.22, subdivision (a) must be bifurcated at a defendant's request, whereas the gang-murder special circumstance is never mentioned in the statute.  (§ 1109, subds. (a) & (b).)  However, defendant argues the "[f]ailure to mention a section 190.2, subdivision (a)(22) enhancement that requires

25.

the same evidence that the Legislature has found prejudicial and worthy of mandatory bifurcation to prove a section 186.22, subdivision (b) or (d) enhancement does create an ambiguity that requires a court to look beyond the literal language of the statute [and a] [f]ailure to look beyond the language of the statute does lead to absurd results, contrary to *Montano's* finding that it does not."

Here, "[d]efendant[] [is] asking us to rewrite section 1109 to expand the scope of its application, which would also require us to judicially amend multiple parts of a different statutory scheme, i.e., section 190.1 et seq. [and in] '[d]oing so would violate the cardinal rule that courts may not add provisions to a statute.' " (*Montano*, *supra*, 80 Cal.App.5th at p. 113.) The Legislature recognized there existed " 'a bifurcated trial process in determining guilt separately from punishment in cases where the death penalty may be imposed [§ 190.1]' " which "shows [it] was cognizant of the statutory procedures governing special circumstance murder allegations." (*Ibid*.) It is unclear as to "why there is no other mention of those procedures generally, or section 190.2(a)(22) specifically, in section 1109, or Assembly Bill 333, or elsewhere in the legislative materials." (*Ibid*.) Although the Legislature's silence is unclear, it could be attributed to its realization it could not amend the statutory provisions of section 190.1, specifically the procedures for trying a special circumstance, without voter approval. (See *People v. Nash* (2020) 52 Cal.App.5th 1041, 1057 ["Proposition 7 'did not authorize the Legislature to amend its provisions without voter approval' "].) With regard to the admission of potentially prejudicial gang evidence, it is also possible the Legislature was unconcerned with this potential for prejudice as it relates to gang-murder but was rather only concerned with "eliminat[ing] or reduc[ing] what it view[ed] as unwarranted punishment stemming from the admission of prejudicial gang evidence." (*Montano*, at p. 106.) A gang-murder unquestionably does not involve "unwarranted punishment." (*Ibid*.; see *People v. Arce* (2020) 47 Cal.App.5th 700, 712–714 [finding the death penalty

for an active gang member who commits murder in furtherance of the gang pursuant to § 190.2, subd. (a)(22) does not violate the Eighth Amendment].)

Notwithstanding legislative intent, even assuming the Legislature "would have enacted a differently worded law had it foreseen future developments, any statutory revisions reflecting that reality must come from that legislature, not the judiciary." (*People v. Bell* (2015) 241 Cal.App.4th 315, 344.) We can appreciate defendant's concern that our court's interpretation of sections 1109 and 190.2 "would lead to absurd results to permit evidence of the redefined term 'criminal street gang' in the guilt phase of the trial merely because the allegation is charged [*sic*] under section 190.2 rather than under section 186.22." This concern is amplified in this case because the prosecutor was permitted to introduce essentially all the gang evidence he intended to present in the trial during phase I (guilt phase), rather than phase II (gang evidence phase). He then incorporated by reference this gang evidence from phase I into phase II and then only asked the gang expert (Officer Hernandez) to respond to one hypothetical in phase II regarding the alleged offenses. Overall, this trial's bifurcation process seems to defeat the underlying purpose behind Assembly Bill 333, which was to ensure that juries are not exposed to overwhelming gang evidence because it " 'can be unreliable and prejudicial … [when] it is lumped into evidence of the underlying charges.' " (*Burgos*, *supra*, 16 Cal.5th at p. 10, quoting Stats. 2021, ch. 669, § 2, subd. (d)(6).) However, when it comes to statutory interpretation, we as the court are asked *only* to apply the plain language of a statute when the statute's language is unambiguous. Section 1109 is clear: "[A] case in which a gang enhancement [or substantive gang offense] is charged under subdivision[s] [(a),] (b) or (d) of Section 186.22[, it] shall be tired in separate phases." (§ 1109, subds. (a) & (b).) Based on the plain language of section 1109, the gang-murder special circumstance is not included.

27.

Accordingly, the trial court properly decided to not bifurcate the gang-murder special circumstance because the provisions stated in section 1109 do not apply to the gang-murder special circumstance allegation.

### 2.     Equal Protection

Further, defendant argues that applying section 1109 only to defendants charged under section 186.22, subdivisions (a), (b), or (d), but not applying it to defendants charged with a gang-murder special circumstance violates equal protections of the laws. (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7.)  Specifically, he argues "[t]here is no compelling state interest in giving defendants charged [with gang enhancements or the substantive gang offense] a bifurcated trial to avoid prejudicing their guilt determinations yet denying that procedural right to defendants charged [with the gang-murder special circumstance]."

"The equal protection clause of the Fourteenth Amendment to the United States Constitution provides that no state may 'deny to any person within its jurisdiction the equal protection of the laws.' [Citation.]  This provision is 'essentially a direction that all persons similarly situated should be treated alike.' [Citation.]  'At core, the requirement of equal protection ensures that the government does not treat a group unequally without some justification.' "[14]  (*Hardin*, *supra*, 15 Cal.5th at p. 847, fn. omitted.)

"Courts apply heightened scrutiny when a challenged statute or other regulation involves a suspect classification such as race, or a fundamental right such as the right to vote, and accordingly will demand greater justification for the differential treatment. [Citations.]  But when a statute involves neither a suspect classification nor a

---

[14]     "The California Constitution also guarantees equal protection of the law … and we see ' "no reason to suppose" that federal equal protection analysis would yield a result different from what would emerge from analysis of the state Constitution.' "  (*People v. Hardin* (2024) 15 Cal.5th 834, 847, fn. 2 (*Hardin*).)

fundamental right, the 'general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.' [Citations.] A court applying this standard finds 'a denial of equal protection only if there is no rational relationship between a disparity in treatment and some legitimate government purpose.' " (*Hardin*, *supra*, 15 Cal.5th at p. 847, italics omitted.)

As our Supreme Court recently held, "[W]hen plaintiffs challenge laws drawing distinctions between identifiable groups or classes of persons, on the basis that the distinctions drawn are inconsistent with equal protection, courts no longer need to ask at the threshold whether the two groups are similarly situated for purposes for the law in question. The only pertinent inquiry is whether the challenged difference in treatment is adequately justified under the applicable standard of review." (*Hardin*, *supra*, 15 Cal.5th at pp. 850–851.)

In *Hardin*, the defendant "argued that section 3051 violates equal protection by treating young adult offenders sentenced to life without parole for special circumstance murder differently from other young adult offenders serving parole-eligible life sentences for other crimes." (*Hardin*, *supra*, 15 Cal.5th at p. 841.) The *Hardin* court disagreed and held the Legislature had a rational basis for treating young adult offenders sentenced to LWOP for special circumstance murder differently than other young adult offenders serving parole-eligible life sentences because: (1) "[i]n the criminal law, there is no violent crime or set of violent crimes considered more serious, or that trigger more severe punishment, than special circumstance murder"; and (2) "[i]t was not irrational for the Legislature to exclude from the youth offender parole eligibility those young adults who have committed special circumstance murder, an offense deemed sufficiently culpable that it merits society's most stringent sanctions." (*Id*. at pp. 863–864.)

Here, similarly to how our Supreme Court dealt with the distinction between special circumstance murder and other life sentence type offenses, "there is no violent

29.

crime or set of violent crimes considered more serious … than special circumstance murder." (*Hardin*, *supra*, 15 Cal.5th at p. 863.)  Accordingly, the Legislature had a rational basis for excluding defendants charged with the gang-murder special circumstance from the benefits of bifurcation outlined in section 1109.  Defendant's equal protection claim fails.

### E.    *Prejudice*

However, even assuming that section 1109 applied to the gang-murder special circumstance, defendant would be unable to establish prejudice.  At the outset, defendant contends "[s]tructural error applies here because 'the defining feature of a structural error is that it affects the framework within which the trial proceeds rather than being an error in the trial itself[]' [citations] [and] '[b]ifurcation necessarily affects the "framework within which the trial proceeds." ' "  However, our Supreme Court in *People v. Tran* (2022) 13 Cal.5th 1169 (*Tran*) flatly rejected this contention.  (*Id*. at p. 1208 ["We first reject [the defendant's] contention that the failure to bifurcate constitutes structural error"].)

Alternatively, defendant argues that "failure to bifurcate implicated [his] state and federal due process right to a fundamentally fair trial, [and] *Chapman v. California* (1967) 368 U.S. 18, 24 [(*Chapman*)][15] should be applied."  Again, he fails to acknowledge *Tran*, which held that unless the failure to bifurcate rendered a trial "fundamentally unfair," the error's prejudicial effect is assessed under the state law standard of *People v. Watson* (1956) 46 Cal.2d 818.  (*Tran*, *supra*, 13 Cal.5th at p. 1209.) *Watson* asks whether it is reasonably probable the defendant would have obtained a better result absent the error.  (*Watson*, at p. 836.)

---

**15**    Under *Chapman*, the People must prove the error "was harmless beyond a reasonable doubt."  (*Chapman*, *supra*, 386 U.S. at p. 24.)

In his reply brief, defendant appears to claim that gang evidence always renders a trial fundamentally unfair, but *Tran* forecloses that position, and he makes no attempt to demonstrate his trial in particular was fundamentally unfair.  Therefore, we turn to address whether the lack of bifurcation regarding the gang-murder special circumstance was prejudicial under *Watson*.

First, defendant would still have been convicted of all the offenses, since there was overwhelming evidence that implicated him in the gas station shooting, including possession of and the subsequent sale of the involved firearm to Gutierrez; his own admission to Jose he shot Canchola; witness statements; and surveillance footage which showed him holding a black object during the fight.  Most importantly, defendant himself testified he shot Canchola; his argument to the jury was he shot him in self-defense and/or in defense of others.  Therefore, "it is unlikely the defendant was harmed by the format of the trial." (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480, citing *People v. Pinholster* (1992) 1 Cal.4th 865, 931, overruled on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459 [failure to bifurcate was harmless because " '[t]here was overwhelming evidence of [the] defendant's guilt on the other charges' "].)

Second, section 1109 does not necessarily preclude gang-related evidence in a bifurcated trial if the evidence relates to the underlying charges.  (*People v. Ramos* (2022) 77 Cal.App.5th 1116, 1132, overruled on other grounds in *Burgos, supra*, 16 Cal.5th at p. 31.)  Here, as in *Ramos*, most of the gang evidence relating to defendant would have been introduced at trial on the underlying offenses because it was relevant to defendant's actions prior to the shooting, and his motive for his actions that night, i.e., responding to the gas station to retaliate against a rival gang member.  (*Ramos*, at p. 1132.; see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049–1050 ["To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary"].)  For example, gang expert

Officer Hernandez testified the gas station where the murder occurred was within the "traditional boundaries of the Uptown Bakers" and that Canchola had been a member of the rival gang, TWK, and had jumped Thornton, who was an active Uptown Bakers gang member. The intent to retaliate against a rival gang member, along with defendant's subsequent actions of killing Canchola made the gang evidence highly relevant to negate self-defense and/or defense of others. Therefore, the gang evidence, including defendant's gang contacts, his gang tattoos, and gang clothing was therefore relevant to establish both his motive and intent in killing Canchola.

Accordingly, applying the *Watson* standard, we conclude it is not reasonably probable the outcome of the trial on the underlying charges would have been different in the absence of the gang evidence supporting the gang-murder special circumstance. Even assuming the failure to bifurcate the gang-murder special circumstance was error, the failure to bifurcate the trial was not prejudicial error and thus there is no basis to reverse defendant's convictions.

## II. Substantial Evidence Supports the Gang-Murder Special Circumstance, Substantive Gang Offense, and Gang Enhancements

Defendant further contends there is insufficient evidence to prove the gang-murder special circumstance, substantive gang offense, and gang enhancements because "[t]he evidence did not establish that the predicate offenses offered to prove a 'pattern of criminal gang activity,' 'commonly benefitted a criminal street gang, and the common benefit from the offense is more than reputational.'" The three predicate offenses presented by the prosecutor was an armed robbery (predicate offense No. 1), an auto theft (predicate offense No. 2), and a stabbing (predicate offense No. 3). As to predicate offense No. 3, the People concede "that the prosecution failed to prove a common benefit arising from the third predicate offense." We analyze each of the three predicate offenses below.

32.

### A. *Standard of Review*

Our standard of review is sufficiency of the evidence. (*People v. Renteria* (2022) 13 Cal.5th 951, 957–958.) We "evaluate the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Ramos* (2016) 244 Cal.App.4th 99, 104.) "[W]e do not reweigh the evidence; the credibility of witnesses and the weight to be accorded to the evidence [because these] are matters exclusively within the province of the trier of fact." (*People v. Stewart* (2000) 77 Cal.App.4th 785, 790.) We "presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053) and disregard any evidence that does not support the judgment as having been rejected by the trier of fact for lack of sufficient veracity (*People v. Ryan* (1999) 76 Cal.App.4th 1304, 1316). " 'If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

### B. Applicable Law

Assembly Bill 333 not only added section 1109, but also made several changes to the definition of the section 186.22 substantive gang offense and gang enhancements. " 'First, it narrowed the definition of a "criminal street gang" to require that any gang be an "ongoing, organized association or group of three or more persons." (§ 186.22, subd. (f).) Second, whereas section 186.22, former subdivision (f) required only that a gang's members "individually or collectively engage in" a pattern of criminal activity in order to constitute a "criminal street gang," Assembly Bill 333 requires that any such pattern have been "collectively engage[d] in" by members of the gang. (§ 186.22,

subd. (f).)  Third, Assembly Bill 333 also narrowed the definition of a "pattern of criminal activity" by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang "members," as opposed to just "persons"; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense.  (§ 186.22, subd. (e)(1), (2).)  Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefited a street gang, requiring that any "common benefit" be "more than reputational."  (§ 186.22, subd. (g).)' "  (*People v. Clark* (2024) 15 Cal.5th 743, 752–753, italics omitted (*Clark*), quoting *Tran*, *supra*, 13 Cal.5th at p. 1206.)  Further, the changes made by Assembly Bill 333 apply to the gang-murder special circumstance.  (*People v. Rojas* (2023) 15 Cal.5th 561, 580.)

      C.    *Analysis*

          1.      **Predicate Offense No. 1**

Predicate offense No. 1 involved an armed robbery.  Officers arrived on scene and found, in defendant's room, a pair of keys with an Oakland A's emblem on them that had been stolen in the robbery, a baseball bat, and blue bandanas.  Defendant, Hernandez, and Madrid were all subsequently arrested for the robbery.  Defendant testified he committed the robbery with Hernandez and Madrid, and that the victim's cell phone and car keys were taken while defendant held the bat.  However, he admitted the victim identified defendant with the gun.

As to this offense, Officer Hernandez testified "[i]t was in the association of the Uptown Bakers because you have more than one individual from the Uptown Bakers that committed the offense … [defendant], you have Joseph Madrid, and Andrew Hernandez who are all three working together to be more successful in this—in committing this

crime." Further, he testified it was for the common benefit of the gang because "from speaking to several gang members as well as [defendant] that the proceeds that are made from this robbery, meaning that whenever they take these items they'll oftentimes sell it to make money, will go—not benefit just the members but the gang as well." Specifically, "they put money on people's books, help out other fellow gang members as well as [defendant] who provided [Officer Hernandez] similar information … [and] the proceeds of—that are acquired from these robberies will go to purchase firearms, ammunition, and other weapons to distribute amongst the gang."

Defendant argues "the gang expert's statement that 'several gang members as well as [himself] had confessed to him that they 'often' sold the items taken in a robbery and gave the money to other gang members is inadmissible case-specific hearsay" in violation of our Supreme Court's holding in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).[16] We disagree. First, defendant's statements to Officer Hernandez were admissible as an opposing party admission (Evid. Code, § 1220), and thus was not made inadmissible by the hearsay rule or *Sanchez*. (*Sanchez*, *supra*, 63 Cal.4th at p. 686 [holding that experts are still permitted to rely on statements that "fall under a statutory exception"].) Second, Officer Hernandez was permitted to testify regarding the "several gang members[']" statements because these individuals were *not* alleged to have been involved in the underlying predicate offense. (*Id*. at p. 676 [the rule only applies to case-specific facts, which "are those relating to the particular events and participants alleged to have been involved in the case being tried"]; see *People v. Valencia* (2021) 11 Cal.5th 818, 839 ["[W]e conclude that facts concerning particular events and *participants alleged to have*

---

**16**     *Sanchez* adopted the following rule: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for the truth." (*Sanchez*, *supra*, 63 Cal.4th at p. 686, fn. omitted.)

*been involved in predicate offenses*, too, constitute case-specific facts that must be proved by independently admissible evidence" (italics added)].) Accordingly, the *Sanchez* rule is not implicated because Officer Hernandez relied on statements from unnamed Uptown Bakers gang members and not from Hernandez or Madrid.

Further, defendant argues we should disregard Officer Hernandez's testimony regarding these statements because he "offered no time, date, or place where these purported statements were made," "offered no identification of who made these purported confessions," and "offered no documented prior statement of [himself] to corroborate the expert's claims." Officer Moe, the investigating officer, testified regarding this offense and was therefore subject to cross-examination regarding these issues. Trial counsel had every opportunity to question Officer Moe regarding these issues, but decided against it. Additionally, all of defendant's concerns involve issues surrounding the weight of the evidence, not its admissibility. (*People v. DuBont* (1965) 235 Cal.App.2d 844, 849 ["The trier of fact is the sole judge of the credibility of witnesses and of the weight to be afforded the testimony of each … [they] may reject any part of a witness' testimony and give credence to other portions"].) Therefore, substantial evidence exists to establish predicate offense No. 1 (armed robbery) commonly benefitted the gang, beyond being reputational. (§ 186.22, subds. (e)(1) & (g).)

### 2. Predicate Offense No. 2

Predicate offense No. 2 involved an auto theft. Specifically, officers located a gold Honda Accord that had been reported stolen. Officers found a shaved key in the ignition and contacted two individuals in the vehicle by the names of Gonzales and Valles. Valles, who goes by the moniker of "Tasor," was an active Uptown Bakers gang member. Defendant also told Officer Hernandez that "auto thefts" are a primary activity of the Uptown Bakers.

As to this offense, Officer Hernandez testified auto theft is a primary activity of the Uptown Bakers and that it "is … in the benefit of the Uptown Bakers because oftentimes when they commit crimes they use a stolen vehicle or a vehicle that they borrowed from somebody else so that what the vehicle cannot be tied back to the person who committed the crime." He believed it was significant the Honda was stopped "within the sphere of influence of the gang territory." Further, he testified "[a]nother way that it would benefit the Uptown Bakers would be they will pretty much take all the parts out of the vehicle and take it to what's known as a chop shop … a place where vehicles are being taken apart so that way the parts can be sold [and] make money out of it." Akin to how robberies benefit the gang, "obtaining the money from these vehicles would benefit them because they can put money [in] other member's books, assist other gang members, purchase firearm, ammunition, anything that the gang may need."

Nonetheless, defendant argues "the state offered no evidence whatsoever to establish what became of this Honda and, more importantly, it offered no evidence that the car in any way benefitted the Uptown Bakers." However, Officer Martin testified he stopped a stolen Honda Accord with a known Uptown Baker gang member by the name of Valles ("Tasor"). Further, he located a shaved key inside the ignition, "which made[] it easy … to steal cars." It was reasonable for the jury to infer that Valles (an active Uptown Bakers gang member) or another gang member in the future was going to use the stolen Honda to commit crimes or have its parts scrapped for money at a chop based on Valles being found in the Honda with shaved keys in the ignition in an area "within the sphere of influence of the gang territory."[17] (See *People v. Stitely* (2005) 35 Cal.4th 514,

---

[17] Defendant in his reply brief focuses a substantial portion of his argument regarding the People's use of the phrase, "[H]ad the car not been seized, it could have been used by Valles to commit crimes or its parts could have been sold for money to fund gang activities." Specifically, defendant takes issue with the word "*could*" because this "doesn't prove that either the act was committed nor does it prove that the gang

543 [when conducting substantial evidence review, "we draw all reasonable inferences necessary to support the judgment"].) Therefore, substantial evidence exists to establish this predicate offense (auto theft) commonly benefitted the gang, beyond being reputational (§ 186.22, subds. (e)(1) & (g)).[18]

### 3. Predicate Offense No. 3

Predicate offense No. 3 involved an assault with force likely to cause great bodily injury. As to this predicate offense, the People agree the prosecution failed to prove a common benefit because "Officer Hernandez opined that the assault, which ultimately resulted in a homicide, would enhance the reputation of the [Uptown Bakers] gang and instill fear in others[,] [b]ut, he did not think the incident would provide a benefit to the gang that was more than reputational." Specifically, the prosecutor asked Officer Hernandez, "Now this incident, would it benefit the Uptown more than reputational?" and he replied, "Other than reputation and instilling fear, no, I don't think there's any other way." Because "the common benefit [must be] more than reputational" (§ 186.22, subd. (g)), we do not consider predicate offense No. 3 in determining whether the People established a " 'pattern of criminal gang activity' " as it relates to the Uptown Bakers gang (*id*. at subd. (e)(1)).

---

benefitted from an unproven act," but rather "express[es] only a 'possibility.' " Thus, he argues "[t]he portion of the gang expert's testimony … contains only speculation about whether the gang actually used the Honda for its benefit." However, Officer Hernandez testified vehicle theft *does* benefit the Uptown Bakers gang in that they use stolen vehicles to commit crimes or sell these vehicles and/or its parts for money. Further, defendant himself admitted Uptown Bakers' members commit auto thefts "for money." Officer Hernandez's opinion was based not on mere speculation, but rather on his own experience with active Uptown Bakers gang members, including defendant.

[18] Although not argued by the parties, it is also important to note that recently our Supreme Court in *Clark* held that predicate offenses can be committed by individual gang members, rather than by two or more gang members. (*Clark*, *supra*, 15 Cal.5th at pp. 753–757.)

As it stands, the People established two predicate offenses that commonly benefitted the Uptown Bakers gang in a way that was more than reputational. (§ 186.22, subd. (e)(1).) Therefore, these two predicate offenses established a " 'pattern of criminal gang activity.' " (*Ibid*.) Accordingly, substantial evidence supports the gang-murder special circumstance, substantive gang offense, and gang enhancements.

## III.    Prosecutorial Misconduct Claim

Defendant further contends the prosecutor during his rebuttal argument engaged in prosecutorial misconduct when he told the jury "that premediated first-degree murder does not require a plan and that 'the issue is the extent of reflection.' " Specifically, he argues "[t]his statement was inaccurate and misled the jury about the distinction between first and second degree murder." He further argues the prosecutor "blurred the distinction between first and second degree murder when he told [the] jury that a deliberate and premeditated decision to kill could be made as quickly as the decision to drive through a yellow light."

As to the argument the prosecutor committed misconduct when he told the "jury a deliberate and premeditated decision to kill could be made as quickly as the decision to drive through a yellow light," the People contend he "forfeited this argument by failing to object to this portion of the prosecutor's closing argument below." However, immediately after argument, trial counsel made " 'a timely and specific objection at trial' and request[ed] an admonition that the jury disregard the improper argument."[19] (*People*

---

[19]    Although trial counsel did not specifically object to the prosecutor's use of the "yellow light" metaphor, he did object to the prosecutor's statement "that premedication is not planning." The prosecutor used the "yellow light" metaphor to explain "a cold calculated decision to kill can be done quickly" and that similarly to deciding whether to speed through a yellow light at an intersection, "[f]irst-degree murder does not require a plan." Because this metaphor encompassed the prosecutor's first degree murder argument, we conclude that trial counsel did preserve the claim on appeal when he objected and asked the trial court for a curative instruction.

*v. Nadey* (2024) 16 Cal.5th 102, 135, quoting *People v. Seumanu* (2015) 61 Cal.4th 1293, 1328.)  Nonetheless, as we discuss in detail below, we conclude the prosecutor did not commit prosecutorial misconduct during his rebuttal argument because his statements regarding first degree murder were proper statements of law.

**A.      *Additional Factual Background***

During the prosecutor's rebuttal argument, he argued the following:

> "First-degree murder does not require a plan.  When you look at the elements of first-degree murder all it says is that the killing had to be willful, premeditation, and deliberation.  It doesn't say you have to have a plan.  It doesn't even say you have to be a bad person.  The issue is the extent of the reflection.  It's not about the length of time.  The jury instruction says that a cold calculated decision to kill can be done quickly.  And you look in the course of, you know, your actions in your daily life as far as how quick we're able to make decisions, how fast we're able to process information and kind of the classic example of how fast we're able to process information is when you're approaching a yellow light and you have to make a decision.  Do I go through the yellow light or do I stop and slow down?  We as human beings are able to process the information around us very quickly and that is what that jury instruction has said.  It's not the length of time that you have but the extent of reflection.  As you're approaching that yellow light there's many factors you're considering.  How far am I from the light?  How fast am I going? Is there a camera at the intersection?  Are there other cars around me?  Our brains are magnificent.  We're able to process that information quickly and you have the ability to go if I go through that yellow light, I might not make it.  Maybe I will make it.  Maybe I'll get a ticket.  Maybe I won't.  The ability to consider the consequences of that action.  And here when you see the video surveillance, the defendant has the gun out immediately as he's on scene.  He's not engaged hands on with John Doe as Eric Escalera and the individual in the white pants are pummeling that individual.  He's got the gun out at the ready and he's watching what's going on.  He's processing.  This is his opportunity to look at what is going on and to consider his next move, what he's going to do, what are the consequences of that.  He had ample time.  But like I said time is not a factor.  It's the extent of the reflection.  That's the analysis."

40.

Subsequently, trial counsel, the prosecutor, and the trial court had the following exchange:

> "[TRIAL COUNSEL]: During the DA's final argument, he told the jury that premeditation is not planning and that's exactly what it is. Premeditation is defined as planning, so I would ask the court to correct that in some fashion.
>
> "[TRIAL COURT]: You're talking about Jury Instruction 521[20]?
>
> "[TRIAL COUNSEL]: Yes. He specifically said premeditation is—a plan is not required, quote/unquote. That's exactly what is required.

---

[20]    The jury was instructed with CALCRIM No. 521, which is as follows:

> "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death.
>
> "The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.
>
> "The requirements for second degree murder based on express or implied malice are explained in CALCRIM No. 520, *First or Second Degree Murder With Malice Aforethought*.
>
> "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder."

41.

"[TRIAL COURT]: All right. Looking at CALCRIM 521, [prosecutor], your response?

"[PROSECUTOR]: Premeditation and deliberation does not require a plan. It requires a decision to be made but there does not have to be a plan in conjunction with the analogy of the Ted Bundy and the Daumer and that sort of thing like you have some drawn out plan to kill a bunch [of] people. All that's required is you made a decision, you had the opportunity to reflect on it and then you did the act. But it doesn't require a plan. It only requires a decision.

"[TRIAL COURT]: [Trial counsel].

"[TRIAL COUNSEL]: Premeditation is defined in every dictionary I found as planning ahead.

"[TRIAL COURT]: But, [trial counsel], you'd agree that the word premeditation is defined in our instructions. I don't need a dictionary. We have it defined in CALCRIM; right?

"[TRIAL COUNSEL]: Yes.

"[TRIAL COURT]: I'm going to rely on the CALCRIM instruction and I'll overrule the objection that you have. I think the arguments [prosecutor] just outlined responding to your analogy with the serial killers is an appropriate response.

"[TRIAL COUNSEL]: But, your Honor, that was a clear misstatement of the law.

"[TRIAL COURT]: How was it?

"[TRIAL COUNSEL]: When he says a plan is not required that's not correct.

"[TRIAL COURT]: Well, you have 521 in front of you?

"[TRIAL COUNSEL]: No, I don't. Sorry.

"[TRIAL COURT]: It doesn't say in there that a plan is required. It says a defendant acted with premeditation if he decided to kill before completing the act that caused death. So I don't think it is a misstatement of the law. I'm not going to go off a Webster's dictionary definition. I'm going to go off of the jury instructions approved by CALCRIM and through

the judicial [council] and numerous courts of opinion, appellate courts of opinion ruling on those. If you have some other authority for me, [trial counsel], I'd be happy to consider it but the dictionary is not going to do it. Let me read it one time just to make sure.

"All right. Any other comments from either one; [trial counsel]?

"[TRIAL COUNSEL]:       No, your Honor.

"[TRIAL COURT]:   [Prosecutor]?

"[PROSECUTOR]:   No.

"[TRIAL COURT]:   I'm going to stick with my tentative ruling. I'm not going to further instruct the jury or admonish them that was a misstatement of the law but stick to the jury instructions I'm giving them including the language in 521. And given the context of the two arguments both from [trial counsel] and from [prosecutor], I don't think there was a misstatement of law. When I compare what was said in the concluding arguments versus the statement of law in 520, 521, et cetera, I don't think there was a misstatement of law."

**B.**      ***General Legal Principles***

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deception or reprehensible methods to attempt to persuade either the trial court or the jury …. [W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) "Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law ….' " (*People v. Centeno* (2014)

60 Cal.4th 659, 666.)  With that being said, "[a] prosecutor's misstatements of law are generally curable by an admonition from the court."  (*Id*. at p. 674.)

## C.    *Applicable Law*

"Murder is the unlawful killing of a human being … with malice aforethought." (§ 187, subd. (a).)  A willful, deliberate, and premeditated killing is first degree murder. (§ 189, subd. (a).)  " ' "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill.  [Citation.]  'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance.  [Citations.]"  [Citation.]  " 'Premeditation and deliberation can occur in a brief interval.  "The test is not time, but reflection.  'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " ' " (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069; see *People v. Mayfield* (1997) 14 Cal.4th 668, 767 [where the defendant wrestled the gun and fatally shot an officer during a brief altercation, the jury could reasonably conclude that "before shooting [the officer] [the] defendant had made a cold and calculated decision to take [the officer's] life after weighing considerations for and against"]; *People v. Rand* (1995) 37 Cal.App.4th 999, 1001–1002 [aiming weapon at victims whom shooter believed to be rival gang members constituted sufficient evidence of premeditation and deliberation].)  As to planning, courts have found the planning activity can happen during an altercation itself and "*over a short period of time* …."  (*People v. Sanchez* (1995) 12 Cal.4th 1, 34, italics added, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Further, CALCRIM No. 521 is a correct statement of law and correctly instructs the jury on relevant legal principles.  Our Supreme Court has long held that CALJIC No. 8.20, the precursor to CALCRIM No. 521, correctly states the law.  (*People v. Millwee* (1998) 18 Cal.4th 96, 135, fn. 13; *People v. Perez* (1992) 2 Cal.4th 1117, 1123;

*People v. Lucero* (1988) 44 Cal.3d 1006, 1021 (*Lucero*).)  A comparison between CALJIC No. 8.20 and CALCRIM No. 521 shows the two instructions are materially identical.

    **D.**    *Analysis*

    Here, the prosecutor correctly stated the law as it relates to premeditation and deliberation.  He argued, "When you look at the elements of first-degree murder all it says is that killing had to be willful, premeditate[ed], and deliberat[e].  It doesn't say you have to have a plan ….  The issue is the *extent of reflection*.  It's not about the length of time.  The jury instruction says that *a cold calculated decision to kill can be done quickly*."  (Italics added.)  Although planning is a *factor* to consider when weighing whether a defendant acted with premeditation and deliberation, it is simply just that, a factor to consider.  (See *People v. Stitely*, *supra*, 35 Cal.4th at p. 543 [when weighing whether a defendant committed premeditated murder, "[a]ppellate courts typically rely on three kinds of evidence … motive, planning activity, and manner of killing"]; but see *People v. Pride* (1992) 3 Cal.4th 195, 247 [these factors *need not* be present in any particular combination to find substantial evidence of premeditation and deliberation].)  As it relates to premeditation and deliberation, the prosecutor relied on the specific language of CALCRIM No. 521 to argue defendant killed Canchola after reflection, even if it was "done quickly."  He simply argued the instruction did not require the jury to find that defendant "planned" the killing before shooting Canchola; rather, all that was required was the killing be " ' "willful, deliberate, and premeditated," ' " which emphasized that defendant needed to act with " 'substantially more reflection than may be involved in the mere formation of a specific intent to kill.' "  (*People v. Arias* (2008) 45 Cal.4th 169, 181.)  Accordingly, the prosecutor did not commit misconduct when he argued that "[f]irst degree murder does not require a plan" because he correctly informed the jury that the issue for premeditation and deliberation "is the extent of the reflection,"

which was a correct statement of the law under CALCRIM No. 521. (*Lucero, supra*, 44 Cal.3d at p. 1021.)

Further, defendant argues the prosecutor "blurred the distinction between first and second degree murder when he told [his] jury that a deliberate and premeditated decision to kill could be made as quickly as the decision to drive through a yellow light." The prosecutor's argument is akin to an argument examined by our Supreme Court in *People v. Avila* (2009) 46 Cal.4th 680 (*Avila*). In *Avila*, "the prosecutor used the example of assessing one's distance from a traffic light, and the location of surrounding vehicles, when it appears the light will soon turn yellow and then red, and then determining based on this information whether to proceed through the intersection when the light does turn yellow, as an example of a 'quick judgment' that is nonetheless 'cold' and 'calculated.' " (*Id*. at p. 715.) After making this analogy, the prosecutor "immediately said, 'Deciding to and moving forward with the decision to kill is similar, but I'm not going to say in any way it's the same. There's great dire consequences that have a difference here.' " (*Ibid*.) The court concluded the prosecutor did not engage in misconduct since he was not equating " 'the "cold, calculated" judgment of murder' " with " 'deciding whether to stop at a yellow light or proceed through the intersection.' " (*Ibid*.)

Defendant acknowledges *Avila* but argues its holding is distinguishable "because the prosecutor [in *Avila*] expressly told the jury that the decision to kill is not similar to making a sudden decision in traffic." However, the thrust of the prosecutor's argument in this case was similar in all material respects to the argument made in *Avila*. Both the prosecutor here and the prosecutor in *Avila* mentioned factors a driver would consider in deciding whether to proceed in the few seconds after seeing a yellow light. As in *Avila*, the yellow light analogy was used in this case to illuminate how a premeditated and deliberate decision to kill could happen quickly, but that premeditation and deliberation do not happen without at least some degree of weighing the consequences. This analogy

accurately reflects the law in that a defendant can quickly make a deliberate, premeditated decision to kill. (*People v. Mendoza*, *supra*, 52 Cal.4th at p. 1069.) In our view, the prosecutor's clear expression concerned the different consequences of a decision to kill versus a decision to enter an intersection when there is a yellow light, and the absence of this expression does not render the prosecutor's analogy improper. It would have been clear to the jury the consequences of entering an intersection with a yellow light were less serious than that of choosing to commit murder.

Finally, defendant argues that "[t]he prosecutor's misstatement of the law was not cured by the language of CALCRIM No. 521." Specifically, he argues the instruction does not accurately define premeditation. However, as noted above, CALCRIM No. 521 is a correct statement of law and correctly instructs the jury on relevant legal principles. (*People v. Millwee*, *supra*, 18 Cal.4th at p. 135, fn. 13; *People v. Perez*, *supra*, 2 Cal.4th at p. 1123; *Lucero*, *supra*, 44 Cal.3d at p. 1021.) CALCRIM No. 521 unambiguously told jurors that premeditation requires a careful weighing of the considerations for and against the defendant's choices. No reasonable juror would review the instruction as a whole and conclude that a mere intent to kill, without reflection and deliberation, would suffice. We therefore reject defendant's argument that CALCRIM No. 521 did not cure any presumed misstatement of law by the prosecutor.

### E.    *Prejudice*

However, even if we assume the prosecutor committed misconduct during his rebuttal argument, defendant is unable to establish prejudice. "[W]here a defendant shows prosecutorial misconduct occurred, reversal is not required unless the defendant can show he suffered prejudice." (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564.) "*Chapman* is implicated if the prosecutor's conduct renders the trial so fundamentally unfair that due process is violated. [Citations.] *Watson* applies where the

47.

prosecutor uses ' " 'deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*Ibid*.)

Here, the prosecutor's argument did not render the trial so fundamentally unfair that it triggered the *Chapman* standard because (1) the trial court properly instructed the jury with the standard instruction on premeditation and deliberation (CALCRIM No. 521); (2) the court instructed the jury to follow its instructions on the law rather than rely on the attorneys' arguments (see *People v. Williams* (2022) 86 Cal.App.5th 1244, 1256 ["[J]urors are 'presumed to have followed the court's instructions' "]); and (3) the evidence is strong in showing that defendant acted with premeditation and deliberation instead of on a rash impulse.[21]  (Cf. *People v. Hendrix* (2022) 13 Cal.5th 933, 942–943 [the failure of the trial court to properly instruct the jury on the law did not withstand harmless error under *Chapman*].)

Further, it is not reasonably probable that a more favorable result would have been reached absent the alleged objectionable argument under *Watson*.  First, the prosecutor's comments regarding first degree murder not requiring a plan and the yellow light analogy were brief and isolated amongst a lengthy argument.  (See *People v. Medina* (1995) 11 Cal.4th 694, 760 ["[W]e see no reasonable probability that the prosecutor's brief and isolated comments could have influenced the jury's guilt determination"].)  Second, defendant conceded that he shot and killed Canchola; his argument was that the killing was justified because he acted in self-defense and/or in defense of others.  Although trial counsel argued defendant acted in self-defense and/or in defense of others, it is clear the jury found otherwise based on the circumstances of the killing.  Other than defendant's

---

[21]    Defendant ran to the gas station to confront Thornton's attacker while holding a firearm.  He then approached Canchola, who was a rival gang member, and shot him in his chest.  It was reasonable for the jury to believe that defendant acted with premeditation and deliberation when he shot and killed Canchola, a rival gang member, in response to Canchola attacking Thornton, a fellow Uptown Bakers gang member.

own recollection of the events, there existed no other evidence he acted in self-defense and/or in defense of others. (See *People v. Beltran* (2013) 56 Cal.4th 935, 954–956 [any error in prosecutor's closing argument to the jury suggesting an incorrect standard regarding provocation on the murder charge was not prejudicial under *Watson* harmless error where the trial court provided a correct statement of law and the defendant's evidence was weak and contradicted].) Accordingly, defendant is unable to establish that any presumed prosecutorial misconduct was prejudicial.

## IV. The Trial Court Properly Imposed the 10-Year Gang Enhancement (§ 186.22, Subd. (b)(1)) as Applied to Count 1

Defendant further contends the trial court erred when it imposed "[t]he 10-year [gang] enhancement on count one … because section 186.22, subdivision (b)(5) makes the life term inapplicable to a felony punishable by a life sentence." We disagree.

In *People v. Lopez* (2005) 34 Cal.4th 1002 (*Lopez*), our Supreme Court held a defendant who commits a gang-related violent felony punishable by life imprisonment is not subject to the 10-year gang enhancement pursuant to section 186.22, subdivision (b)(1)(C), but rather is subject to a minimum parole eligibility term of 15 years pursuant to section 186.22, subdivision (b)(5). (*Lopez*, at p. 1010.) Section 186.22, subdivision (b)(5) provides, "Except as provided in paragraph (4), a person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served."

However, *Lopez* did not involve a defendant sentenced to LWOP; rather, the defendant was sentenced to a term of 25 years to life for first degree murder. (*Lopez*, *supra*, 34 Cal.4th at p. 1005.) Further, our Supreme Court has suggested the minimum parole eligibility provision was never intended to apply to persons sentenced to LWOP. Specifically, the *Lopez* court analyzed the legislative history of the California Street Terrorism Enforcement and Prevention Act (§ 186.20 et seq.; STEP Act) and noted a

1988 enrolled bill report written by the Youth and Adult Correctional Agency analyzing the financial impact of the provision, which stated: " ' "This proposed provision relating to life terms [former section 186.22, subdivision (b)(3), now section 186.22(b)(5)] would apply to all lifers (*except life without the possibility of parole*)." (*Lopez*, at p. 1010, italics added.) The *Lopez* court concluded that "at the time the STEP Act was enacted, the predecessor to section 186.22(b)(5) was understood to apply to all lifers, except those sentenced to life without the possibility of parole." (*Lopez*, at p. 1010, italics omitted.)

Here, defendant was sentenced to LWOP for first degree murder with a true finding as to the gang-murder special circumstance. Because a LWOP term contains no anticipated parole date, it would be illogical to include a minimum parole date on such a term. Thus, based on our Supreme Court's holding in *Lopez,* we conclude the minimum parole eligibility date, as stated in section 186.22, subdivision (b)(5), does not apply to LWOP terms. Accordingly, the trial court properly imposed the 10-year gang enhancement (§ 186.22, subd. (b)(1)), as applied to count 1.

## V.      Section 1385, Subdivision (c)

Finally, defendant contends "[t]he record does not show that the trial court was aware of its discretion to dismiss multiple enhancements under Penal Code section 1385, subdivision (c)." (Capitalization omitted.) The People argue defendant "forfeited any argument that the court erred in applying section 1385 by failing to assert any applicable provisions of the statute at the sentencing hearing." We agree with the People that defendant has forfeited this argument on appeal. Nonetheless, even if we consider this argument, it fails on the merits.

### A.      *Additional Factual Background*

At defendant's sentencing, the trial court noted that it would not consider the rule 4.421(b)(3) aggravating factor because defendant "was not sentenced to a prior term of state prison or county jail pursuant to [section] 1170(h)." However, the trial court stated

50.

it would add the rule 4.421(b)(5) aggravating factor because "defendant's prior performance on probation, mandatory supervision, post-release community supervision, or parole was unsatisfactory." Subsequently, the trial court made the following findings:

> "I will note for the record that the defendant does have several circumstances in mitigation. One is that he is relatively young. He was under the age of 26 years at the time of the commission of the crime. An additional Circumstance in Mitigation Number 2 is that he has a number of crimes and enhancements here which could result in a sentence of over 20 years. Number 3, there are multiple enhancements that have been alleged all in this single case.

> "With respect to the circumstances in aggravation, I'm not going to take the time to go ahead and read all those on the record. And I'd like to incorporate by reference all of the circumstances in aggravation listed in the probation report excluding Number 9 as I previously discussed and adding Number 11 as I also previously mentioned. So those should all be incorporated by way of reference."[22]

---

[22] The February 16, 2023 probation report lists the mitigation and aggravating factors as follows:

"Circumstances in Mitigation:

"(1).    The defendant was under 26 years of age at the time of the commission of the offense.

"(2).    Application of an enhancement could result in a sentence over 20 years[.]

"(3).    Multiple enhancements are alleged in a single case.

"Circumstances in Aggravation:

"(1).    The crime involved great violence, great bodily harm, threat of great bodily harm or other acts disclosing a high degree of cruelty, viciousness, or callousness (Pled and proven; this allegation constitutes dual use and will not be considered for the upper term.)

"(2).    The defendant was armed with or used a weapon at the time of the commission of the crime (Pled and proven; this allegation constitutes dual use and will not be considered for the upper term.)

The trial court continued:

"The defendant, I found, has been given multiple opportunities to correct his lifestyle and rehabilitate himself and lots of public resources have been spent in that effort both as a youth offender and as an adult. And despite those the defendant has continued to engage in wrongful conduct and in fact, as seen by this case, escalating and increasingly serious and violent actions. For that reason a prison sentence is absolutely justified.

"After reviewing all the circumstances in aggravation that I've gone over and the circumstances in mitigation, I do find that the selection of a term is appropriate. The upper term is warranted. I'll basically follow the probation recommendations throughout the report from here on out.

---

"(3). The defendant induced others to participate in the commission of the crime or occupied a position of leadership or dominance of the other participants in it[]s commission. (Pled and proven)

"(4). The defendant induced a minor to commit or assist in the commission of the offense. (Pled and proven)

"(5). The defendant was convicted of other crimes for which consecutive sentences could have been imposed but for which concurrent sentences are being imposed. (Pled and proven)

"(6). The manner in which the crime was carried out indicates planning, sophistication, or professionalism. (Pled and proven)

"(7). The defendant has engaged in violent conduct that indicates a serious danger to society as evidenced by present conviction and prior convictions for PC 174.4, PC 243(b), and PC 212.5(c). (Pled and proven)

"(8). The defendant's prior convictions as an adult and sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness. (Pled and proven)

"(9). The defendant has served a prior prison term or county jail under Section 1170(h). (Pled and proven)

"(10). The defendant was on probation when the crime was committed. (Pled and proven)"

"Specifically with respect to Count 3, I do think consecutive sentencing is appropriate because the victim in Count 3 was alleged to have been Mr. [J.M.], which is a separate and independent set of acts against that particular victim as opposed to Mr. Canchola, who was the victim in other counts including Number 1. I also find that Count 4 should run consecutive for the same reasons. The alleged victim in Count 4 was a John Doe and although we never had the person's name, that individual was clear in the video tapes that we saw in evidence and it was a separate series of criminal acts perpetrated against that particular victim, which justified an independent and separate sentence so therefore it will also be consecutive.

"With respect to all of the other counts particularly 2, 5, and 6, they will be run concurrent—or excuse me, not concurrent. They'll actually be stayed pursuant to Penal Code section 654 because unlike Counts 3 and 4 all of the actions that form the basis for those convictions were an integral part of the counts that defendant was convicted of in Count 1, so it's part and parcel to the same set of conduct and therefore will be stayed under [section] 654.

"With respect to the Penal Code section 667(a) enhancements, again, I will be following the California Supreme Court case in *Williams*[23] and that does allow and basically dictate that a five-year enhancement under 667(a) be imposed twice, once for the indeterminate term and an additional five-year term for the determinate term." (Italics added.)

## B. *Forfeiture*

" 'A party in a criminal case may not, on appeal, raise "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" if the party did not object to the sentence at trial. [Citation.] The rule applies to "cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number

---

[23] The trial court did not articulate the case citation for *Williams*. Presumably the trial court was referring to our Supreme Court's holding in *People v. Williams* (2004) 34 Cal.4th 397, which held that "under the Three Strikes law, section 667(a) enhancements are to be applied individually to each count of a third strike sentence." (*Id*. at p. 405.)

53.

of valid reasons ….” ’ ” (*People v. Scott* (2015) 61 Cal.4th 363, 406.)  “Strong policy reasons support this rule:  ‘It is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided.  [Citations.]’ [Citation.]  ‘ “ ‘ “The law casts upon the party the duty of looking after his legal rights and of calling the judge’s attention to any infringement of them.  If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal.” ’ ” ’ ”  (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114; accord, *People v. Salazar* (2016) 63 Cal.4th 214, 239–240; *People v. French* (2008) 43 Cal.4th 36, 46.)

“ ‘[D]iscretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue.’ ”  (*In re Sheena K.* (2007) 40 Cal.4th 875, 887, fn. 7.)  Absent a substantive change in the law that applies retroactively (e.g., *People v. Salazar* (2023) 15 Cal.5th 416, 431–432; *People v. Stamps* (2020) 9 Cal.5th 685, 698–699), or an extenuating circumstance such as the futility of objecting under the then-governing substantive law (e.g., *People v. Perez* (2020) 9 Cal.5th 1, 7–8; *People v. Brooks* (2017) 3 Cal.5th 1, 92), neither of which are present here, the policy reasons underlying the forfeiture doctrine fully support its application where a defendant remains silent on an issue in the trial court when sentenced and then seeks to obtain appellate relief based on asserted sentencing errors that could have been raised at the time of sentencing.

C.    *Applicable Law*

“Effective January 1, 2022, Senate Bill No. 81 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1) amended section 1385 to add specific mitigating factors the trial court must consider when deciding whether to strike enhancements from a defendant’s sentence in the interest of justice.  [Citations.]  Section 1385, subdivision (c) now

provides: '(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute. [¶] (2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the [enumerated] mitigating circumstances … are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety.' " (*People v. Burke* (2023) 89 Cal.App.5th 237, 242–243, italics omitted.)

### D.    *Analysis*

Here, defendant does not argue the trial court failed to consider any specific mitigating circumstance, but rather argues "the record does not show the trial court was aware of its discretion to dismiss an enhancement on count three where street gang and serious felony prior enhancements were found." This is a flawed argument for two reasons. First, the reason why the record is silent is due to the fact that trial counsel never asked the trial court to exercise its discretion to dismiss any of the enhancements pursuant to section 1385. (*People v. Stowell*, *supra*, 31 Cal.4th at p. 1114.) Second, we presume the trial court properly applied established law in exercising its sentencing discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 376–377.) Neither the trial court's failure to reference alternative sentencing choices nor a record "silent concerning whether the trial court misunderstood its sentencing discretion" undercuts this presumption. (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1229; accord, *People v. Weddington* (2016) 246 Cal.App.4th 468, 492.) A record silent as to the trial court's understanding of its sentencing discretion always includes the possibility the trial court misunderstood its sentencing discretion. But it is not for this court to speculate as to how sentencing discretion might have been exercised. (*People v. Barocio* (1989) 216 Cal.App.3d 99,

110.)  Accordingly, the record does not indicate the trial court in fact misunderstood its discretion to dismiss the enhancements pursuant to section 1385.  Given the record's silence, we will not disturb the trial court's sentencing decision on appeal.  (See *Carmony*, at pp. 376–377; *Brown*, at p. 1229.)

## **DISPOSITION**

The judgment is affirmed.


                                                  DE SANTOS, J.

WE CONCUR:


LEVY, Acting P. J.


MEEHAN, J.